**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| AMP'D MOBILE, INC., | ) | Case No.  07-10739 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| ASURION INSURANCE | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 07-51607 (BLS) |
| | ) | |
| AMP'D MOBILE, INC. | ) | |
| | ) | |
| Debtor/Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KINGS ROAD INVESTMENTS LTD., | ) | |
| | ) | |
| Intervenor/Defendant. | ) | |

## OPINION[1]

Before the Court is the question of whether funds collected by Amp'd Mobile, Inc. ("Amp'd" or the "Debtor") from its customers for insurance on cellular equipment are held in trust for the benefit of Asurion Insurance Services, Inc. ("Asurion") or are property of the Debtor's estate within the meaning of section 541 of the Bankruptcy Code (the "Code").  For the reasons set forth below, the Court concludes that the funds in question

---

[1]    This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

1

are property of the Debtor's estate and are not held in trust for the benefit of Asurion.

## I.  **BACKGROUND**

The Debtor engaged in the business of operating a mobile phone and entertainment service, primarily targeting younger customers between the ages of eighteen and thirty.  Amp'd distinguished itself from competitors by offering and emphasizing a broad range of media content that customers could download onto their mobile handsets, including music, video and games.  Amp'd did not own or maintain its own wireless network.  Instead, it utilized the network of Cellco Partnership d/b/a Verizon Wireless ("Verizon") pursuant to a Wholesale Agreement dated June 1, 2005. In essence, Amp'd operated on Verizon's network.

The Debtor filed its voluntary petition under Chapter 11 of the Code on June 1, 2007.  The Debtor's bankruptcy filing was occasioned generally by a liquidity crisis brought on by difficulties Amp'd encountered in collecting accounts receivable, and more immediately by a notice of termination received from Verizon on the Petition Date.

The Debtor announced at the outset of its bankruptcy proceedings that its twin goals were to stabilize its relationships with Verizon and other critical service suppliers, and thereupon to obtain financing sufficient to permit it to reorganize.  Unfortunately, despite reaching at least a temporary

2

accord with Verizon in the early weeks of the case, the Debtor
could not obtain new financing.  Amp'd terminated services to its
customers on August 2, 2007, after a brief but unsuccessful
effort to sell itself as a going concern.

## A.    **The Asurion Program**

In connection with signing up new customers, Amp'd offered
those customers the opportunity to purchase insurance to protect
against loss or damage to the handset.  To provide this coverage,
Amp'd entered into a Handset Protection Service Agreement (the
"Service Agreement") with Asurion, whereby Asurion agreed to
develop and administer a wireless loss, theft, and damage program
for the Debtor's customers.  (Asurion Trial Ex. 1 at 3145 ¶ 1.1).
In return, the Debtor agreed to bill and collect from its
customers the monthly premiums for protection coverage (the
"Premiums") and then remit payment to Asurion on a monthly basis.
(Asurion Trial Ex. 1 at 3147-48 ¶ 2.3).  Asurion contracted
separately with Liberty Mutual Insurance Company ("Liberty
Mutual"), a licensed insurance company that would actually
provide the insurance coverage.  (See Asurion Trial Ex. 3).
Under its agreement with Liberty Mutual, Asurion was required to
remit the Premiums to Liberty Mutual.  (Asurion Trial Ex. 3 at
1336).

In a typical transaction, at the time the Debtor sold
cellular telephones or other wireless equipment to a customer,

3

the Debtor would inform the new customer about the availability of protection coverage.  If the customer then chose to sign up for protection coverage, Asurion would provide the coverage by acting as an agent for Liberty Mutual.  Under the Service Agreement, by the fifth day of every month, the Debtor was to provide Asurion with a list of all customers enrolled in the protection coverage program for any part of the prior month. (Asurion Trial Ex. 1 at 3147-48 ¶ 2.3).  By the fifteenth day of the month, the Debtor would then remit to Asurion the applicable monthly Premiums for those customers who had chosen to participate in the insurance program.  (Asurion Trial Ex. 1 at 3147-48 ¶ 2.3).  Premiums due were calculated as the product of the number of participating customers, multiplied by the monthly charge for the handset protection coverage.  (Asurion Trial Ex. 1 at 3147-48 ¶ 2.3).

## B.   **Procedural Background**

On June 12, 2007, Asurion filed its Motion for Relief from the Automatic Stay Pursuant to section 362(d) of the Code (the "Stay Relief Motion"), in which it sought leave to file a complaint against the Debtor seeking turnover of all Premiums collected by the Debtor under the handset protection coverage program.  The Debtor and the Debtor's prepetition lender, Kings Road Investments Ltd. ("Kings Road"), each objected to the Stay

Relief Motion.[2]

On June 28, 2007, the Court held a hearing on the Stay Relief Motion and, after hearing from all parties, granted the Stay Relief Motion.  The Court also scheduled a trial to determine the limited issue of whether the Premiums the Debtor collected from its customers are property of the Debtor's estate within the meaning of section 541 of the Code.

Upon the entry of the Order granting the Stay Relief Motion, Asurion filed a complaint (the "Complaint") against the Debtor alleging breach of contract, conversion and breach of fiduciary duty.  Concurrently with the filing of the Complaint, Asurion also filed a Motion for a Temporary Restraining Order and Preliminary Injunction.  Asurion seeks, among other things, the imposition of a constructive trust and an injunction requiring the turnover to Asurion of all Premiums received by the Debtor.

C.    **The Parties' Positions**

Asurion contends that there are both contractual and statutory grounds for imposition of a constructive trust.  As to the parties' contractual relationship, Asurion argues that the Service Agreement created a "conduit" role, whereby the Debtor was obligated to collect and pass on to Asurion the Premiums from the Debtor's customers.  (Asurion Br. 12 ¶ 16 & 17) [Docket No.

---

[2]    By Order dated June 8, 2007, the Court authorized Kings Road to intervene as a defendant in this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7024.

14].  As a "mere conduit," Asurion contends that the Debtor did
not acquire any interest in or right to the Premiums.
Additionally, Asurion places great weight on the fact that the
employee training materials prepared in connection with
implementing the handset insurance plan explicitly state that the
Premiums are "our [i.e., Asurion's] property."  (Asurion Trial
Ex. 2 at 274).  As an alternative theory, Asurion contends that
applicable provisions of California insurance law impose a
fiduciary relationship between it and the Debtor, such that (by
operation of state law) the Debtor held the Premiums in a
fiduciary capacity for the benefit of Asurion.  (Asurion Br. 14-
15 ¶ 19).

     The Debtor opposes imposition of a constructive trust and
argues first that the Service Agreement and related materials do
not give rise to a fiduciary relationship, but merely a typical
debtor-creditor relationship between it and Asurion.  In support
thereof, Debtor points to the lack of express language in the
governing documents that would serve to create a fiduciary or
agency relationship; the lack of any requirement for the Debtor
to segregate the Premiums from the Debtor's other funds; and the
Debtor's obligation to pay Asurion irrespective of whether the
Debtor actually collected any Premiums from its customers.  (See
Debtor's Br. 13 ¶ 36) [Docket No. 37].  As to the argument that
California law imposes a fiduciary relationship, Debtor contends

that Asurion has waived the right to enforce those statutory provisions.  (Debtor's Br. 8 ¶ 22).  Finally, the Debtor argues that even if a fiduciary or agency relationship did arise (either by contract or by operation of statute), Asurion's request for imposition of a constructive trust must fail because, in the absence of segregation of the Premiums, Asurion cannot trace or identify any specific funds in the Debtor's possession which would represent Premiums received.  (Debtor's Br. 20 ¶ 52).

The matter has been fully briefed and argued and is ripe for decision.

## II.   <u>JURISDICTION AND VENUE</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. §§ 157(b)(2)(A), (B), and (O).

## III.   <u>DISCUSSION</u>

Asurion seeks a determination from this Court that the Premiums are not property of the Debtor's estate within the meaning of section 541(a), and further requests that this Court impose the equitable remedy of a constructive trust.  To establish its rights as a trust recipient, Asurion must "(1) demonstrate that the trust relationship and its legal source exist, and (2) identify and trace the trust funds if they are

7

commingled." <u>City of Farrell v. Sharon Steel</u>, 41 F.3d 92, 95 (3d Cir. 1994).  Property held by a debtor is presumed to be property of the estate, <u>Skilled Nursing Professional Services, A Division of Skilled Nursing Home Care, Inc. v. Sacred Heart Hosp. of Norristown (In re Sacred Heart Hospital of Norristown)</u>, 175 B.R. 543, 555 (Bankr. E.D. Pa. 1994), and unrelated commercial entities are presumed by the Court to be in a debtor-creditor relationship, rather than a fiduciary relationship, absent evidence that the parties intended a more substantial relationship.

New York law governs questions arising under the Service Agreement.  (Asurion Trial Ex. 1 at ¶ 9.1).  Under New York state law, a party seeking imposition of a constructive trust must establish the existence of: (i) a confidential or fiduciary relationship; (ii) an express or implied promise; (iii) a transfer of property made in reliance upon that promise; and (iv) unjust enrichment.  <u>Sharp v. Kosmalski</u>, 351 N.E.2d 721, 723 (N.Y. 1976).  The absence of any one of the foregoing elements is fatal to a party's request for imposition of a constructive trust.  The Court will thus consider the threshold question of whether a fiduciary relationship was intended, or subsists by operation of law, between the Debtor and Asurion.

**A.   <u>Contractual Basis for Fiduciary Relationship.</u>**

As to the contractual basis, Asurion contends that the

8

parties intended for Amp'd to act "as a conduit for Asurion."
(Asurion Br. 12 ¶ 16).  The record reflects that the Service
Agreement does indeed require Amp'd to collect and remit the
Premiums to Asurion on a regular basis, and the training
materials and insurance policy do explicitly state that the
Premiums are the "property of" either Asurion or Liberty Mutual.
(See Asurion Trial Ex. 1 at 3147-48 ¶ 2.3; Asurion Trial Ex. 2 at
247).  In addition, the testimony of Randall Dickow, the Director
of Logistics of Amp'd, reflects that it was his "business
understanding" that the Premiums collected by Amp'd belonged to
Asurion.  (Debtor's Trial Ex. 25 at 30:5-32:25, 51:4-53:21).

Nevertheless, careful review of the documents and
consideration of the parties' actual conduct indicates that the
parties intended no fiduciary or agency relationship to arise
here.  The Service Agreement lacks those features described more
fully below which would substantiate a fiduciary relationship,
and neither the relevant documents nor the parties' course of
conduct support a finding that either of the parties intended for
Amp'd to serve as a mere conduit for relaying Premiums to Asurion
and ultimately to Liberty Mutual, the insurer.

The Third Circuit's ruling in Official Committee of
Unsecured Creditors of the Columbia Gas Transmissions Corp. v.
Columbia Gas Systems Inc. (In re Columbia Gas Systems Inc.), 997
F.2d 1039 (3d Cir. 1993) is particularly helpful in analyzing the

9

instant dispute.  Both Amp'd and Asurion have cited the decision in support of their respective positions.  The Court finds that a careful reading and application of the Columbia Gas decision yields the conclusion that the facts of the instant case do not warrant imposition of a constructive trust because Amp'd was neither a fiduciary to Asurion nor a "mere conduit" for the transmission of the Premiums from the Debtor's customers through to Asurion.

In Columbia Gas, the debtor owned a natural gas pipeline and sought authority to pay three distinct categories of prepetition claims on the grounds that the debtor was merely holding funds in trust for these identified creditors.  Columbia Gas, 997 F.2d at 1050-51.  In particular, the debtor sought to pay "(1) refunds collected from upstream suppliers and owed to Columbia's customers; (2) research surcharges collected from customers and owed [pursuant to federal regulation] to a non-profit industry research institute; and (3) bills for purchases of natural gas [by Columbia] from upstream suppliers."  Id. at 1051.

Applying common law trust principles, the court concluded that the customer refunds were held in trust by Columbia and thus were not property of the debtor's estate.  Id. at 1062.  "When Columbia remits refunds to its customers, it is not paying them for goods or services rendered. . . . [I]t acts as a 'receiving and transmitting agent,' or a conduit, for money upstream

10

suppliers owe to overcharged consumers." Id. at 1061. Likewise, the court held that the research surcharges were not property of Columbia's estate, because the federal regulatory structure that gave rise to the surcharges made it abundantly clear that Columbia was simply a conduit for these surcharges. Id. at 1062. In particular, federal regulations required Columbia to "track monies owed to GRI [a non-profit research institute] in a separate paper account. . . . Columbia merely collect[ed] money from its customers on behalf of GRI." Id.

As to the "upstream pipeline payments" (meaning claims of producers who sold natural gas to Columbia, which Columbia then re-sold to its own customers), the Court determined that these funds were property of the debtor's estate and not held in trust by Columbia. Id. at 1063. The Court found that these claims arose out of a standard vendor-purchaser relationship and thus did not give rise to a fiduciary relationship or a "mere conduit" role for Columbia:

> The obligations owed to upstream pipelines clearly are debts. Columbia owes the upstream pipelines money for goods and services they have provided to Columbia. Although Columbia's customers pay the charges of the upstream suppliers dollar-for-dollar through Columbia's rates, the chronology of the flow of money is totally different from the customer refunds and GRI surcharges. The bankruptcy court found Columbia pays upstream suppliers and *subsequently* recovers its costs from its customers. Since Columbia pays the upstream suppliers before it receives money from its customers, Columbia does not act as

11

> a conduit or a collecting agent for the
> upstream suppliers.  The upstream pipelines
> are in the same position as every other
> unsecured creditor.

Id.

Applying these principles to the case at hand, the Court concludes that the contractual and business relationship between Amp'd and Asurion is substantially more similar to the upstream pipeline payments in Columbia Gas than to either the customer refunds or research surcharges.  Substantial indicia supporting an inference of a fiduciary or trust relationship – such as clear and explicit language in the governing documents, affirmative statements in governing documents that the Debtor would have no interest in the Premiums, segregation of Premiums, a chronology of payments requiring the Debtor to remit only those Premiums actually received from its customers – are lacking here. Accordingly, the Court concludes that the parties' contractual relationship gave rise to a debtor-creditor, and not a fiduciary, relationship.

Asurion's contention that the parties intended the Debtor to serve as a "mere conduit" for funneling Premiums from customers to Asurion likewise fails on several grounds.  First, Amp'd was under no contractual obligation to segregate, trace or otherwise separately account for Premiums received.  Second, Amp'd was obligated to pay the Premiums to Asurion without regard to whether its customers ever paid Amp'd.  This point is critical:

the Court in Columbia Gas expressly found that the chronology of payments is central to a determination of a "conduit" relationship, and this Debtor's independent obligation to pay only bolsters the conclusion that the Premiums represented debts owed by Amp'd to Asurion, and not funds held in trust.  Id. at 1063 ("The upstream pipelines have supplied a product and services to a company that filed bankruptcy, and they must share the risk of bankruptcy with all other creditors.").  Third, the conclusory statement in the training materials that the Premiums are Asurion's property is in no way dispositive.  The record, and the nature of the business relationship at issue here (with Asurion being the expert in the insurance services industry), already support the conclusion that the employee training materials were largely or entirely prepared by Asurion and thus the Court is reluctant to deem snippets from the training materials to be binding admissions upon the Debtor for purposes of this dispute.

The fact that Asurion must look to collateral sources, such as the training materials and deposition testimony, in an effort to establish a fiduciary or conduit relationship is especially unpersuasive in light of Asurion's contractual relationship with Liberty Mutual.  Review of the governing documents of that relationship makes it abundantly clear that a fiduciary or agency relationship was intended to be created between Asurion and

13

Liberty Mutual: the Agency Agreement explicitly provides for it, and the precise directions for handling the Premiums support the finding that an agency relationship pertained between Asurion and Liberty Mutual.  In particular, the Agency Agreement states:

> J.  <u>Fiduciary Capacity – Premium Trust Funds.</u>  Agent [Asurion] shall act as fiduciary for the Company [Liberty Mutual] with respect to premiums as set forth herein:
>
> .  .  .  .
>
>    2.  Agent, upon receipt, agrees to hold all premiums and any other amounts collected and received on Policies for Company <u>in a fiduciary account separate and apart from all other funds of Agent</u> or otherwise in a bank which is a member of the Federal Reserve System and insured by the Federal Deposit Insurance Corporation and which is approved in writing by the Company.  The bank account shall be designated by Agent in such a manner as to clearly establish that Agent is holding and acting as trustee for Company with respect to the funds in the account ("Premium Trust Funds").  Interest or other income, if any, accruing on these Premium Trust Funds may be retained by Agent for its own account so long as Agent is current in all accounts with Company.

(Debtor's Trial Ex. 5 at 3189 (emphasis added); <u>see also</u> Debtor's Trial Ex. 12 at 3445-46 (same fiduciary role and segregation requirement imposed upon Asurion)).  The record therefore reflects that Asurion knew how to clearly document a fiduciary relationship, and its failure to do so with regard to the Debtor supports the conclusion that no such fiduciary or trust

14

relationship was intended or created under the Service Agreement
or other documents.

B.   **Statutorily Imposed Fiduciary Relationship**

Asurion contends that even if the Service Agreement did not
give rise to a fiduciary relationship, one is imposed upon the
parties by operation of California insurance law.  (Asurion Br.
14-15 ¶ 19).  More specifically, Asurion argues that pursuant to
section 1733 of the California Insurance Code, the Debtor held
its subscribers' Premiums in a fiduciary capacity.  Section 1733
provides, in pertinent part, that "[a]ll funds received by any
person acting as an insurance agent . . . as premium or return
premium on or under any policy of insurance or undertaking of
bail, are received and held by that person in his or her
fiduciary capacity."  CAL. INS. CODE § 1733.

Under California law, the Debtor was required to obtain a
limited license to offer insurance to consumers for their
communication devices.[3]  With Asurion's assistance, the Debtor
applied for and was granted the required communications equipment

---

[3]      See CAL. INS. CODE § 1631 ("[A] person shall not solicit,
negotiate, or effect contracts of insurance . . . unless the
person holds a valid license from the commissioner . . . ."); see
also CAL. INS. CODE § 1758.6 ("No communications equipment vendor
shall offer or sell any form of communications equipment
insurance in this state unless that person is licensed as an
insurance agent or broker pursuant to Article 3 (commencing with
Section 1631) or has complied with the requirements of this
article and has been issued a license of the commissioner as
provided in this article.").

15

insurance agent license, authorizing "the licensee to offer or sell insurance in connection with, and incidental to, the sale of communications equipment . . . ."  CAL. INS. CODE § 1758.61. Asurion argues that the Debtor acted as an insurance agent, and thus pursuant to section 1733, any payments received from subscribers for their handset device insurance were held for the benefit of Asurion.

In response, the Debtor argues that section 1758.661 of the California Insurance Code applies to exempt it from owing any fiduciary duties to Asurion concerns treatment of funds collected by licensees from consumers.  Section 1758.661 states that:

> A licensee shall not be required to treat moneys collected from consumers purchasing insurance pursuant to this article as funds received in a fiduciary capacity <u>if the insurer represented by the licensee has provided in writing that the funds need not be segregated</u> from funds received by the communications equipment vendor on account of the sale of communications equipment <u>and the charges for insurance coverage are itemized and incorporated as part of the customer's bill</u>.

CAL. INS. CODE § 1758.661 (emphasis added).

The Debtor argues that the written notice requirement has been satisfied by both the Agency Agreement and the Inland Marine Program Administration Agreement ("IMPAA"), entered into by and between Asurion and Liberty Mutual.  Both of these agreements provide that "communication equipment vendors and their

16

representatives are not fiduciaries of [Liberty Mutual]."
(Debtor's Trial Ex. 5 at 3189; Debtor's Trial Ex. 12 at 3445).
Accordingly, the Debtor argues that pursuant to section 1758.661
it owes no fiduciary duty toward either Asurion or Liberty Mutual
with respect to insurance payments it received from its
subscribers.

Asurion contends that section 1758.661 implicitly requires
that written notification be given to the licensee (meaning the
Debtor) and that it never "provided in writing" to the Debtor
that it need not segregate funds.  Further, because the Debtor
was a party to neither the Agency Agreement nor to the IMPAA,
Asurion argues that those documents cannot serve as written
notice to the Debtor, and the Debtor is therefore not exempted
from the fiduciary capacity mandated under section 1733.

As with any question concerning the interpretation of a
statute, the Court begins its analysis with the plain meaning of
the statute.  "It is well established that 'when the statute's
language is plain, the sole function of the courts - at least
where the disposition required by the test is not absurd - is to
enforce it according to its terms.'"  Lamie v. U.S. Trustee, 540
U.S. 526, 534 (2004) (quoting Hartford Underwriters Ins. Co. v.
Union Planters Bank, N.A., 530 U.S. 1, 6 (2004)).  In addition,
"[i]t is a 'fundamental canon of statutory construction that the
words of a statute must be read in their context and with a view

17

to their place in the overall statutory scheme.'"  Food and Drug
Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133
(2000) (quoting Davis v. Michigan Dept. of Treasury, 489 U.S.
803, 809 (1989)); see also Crandon v. United States, 494 U.S.
152, 158 (1990) ("[I]n determining the meaning of the statute, we
look not only to the particular statutory language, but to the
design of the statute as a whole and to its object and policy.").

Subject to an exception discussed below, the plain language
of section 1733 provides that an insurance agent who collects
premiums under an insurance policy holds those funds in a
fiduciary capacity for the benefit of the insurer.  CAL. INS. CODE
§ 1733.  See United Equitable Life Ins. Co. v. Trans Global
Corp., 679 F. Supp. 769, 777 (N.D. Ill. 1988) (holding that under
California State law defendants did not violate their statutory
fiduciary duty, because they never received premiums, but
remitted their own funds instead).  Once a fiduciary capacity is
created under section 1733, sections 1734 and 1734.5 require that
the funds be held maintained in separate accounts.  CAL. INS. CODE
§§ 1734, 1734.5; see Middlesex Ins. Co. v. Mann, 177 Cal. Rptr.
495, 503 (Cal. Ct. App. 1981) ("The fiduciary obligations
described in sections 1733 and 1734 were designed to effectuate a
public policy of protecting both insurers and policyholders from
the mishandling and dissipation of premium payments."); see also
Vesta Fire Ins. Corp. v. Ins. Ventures, Inc., 2006 WL 314488, at

18

*3 (E.D. Cal. Feb. 9, 2006) (finding defendant to have breached its statutory fiduciary duty by commingling insurance premiums it had collected on behalf of the plaintiff).  A licensee can only be exempted from the fiduciary duty imposed under section 1733 if the insurer provides in writing that the funds received need not be segregated and if the licensee itemizes the premium billed to its subscribers.  (CAL. INS. CODE § 1758.661).  The record reflects that the Premiums appeared as separate line items on customer billing statements.  (Asurion Trial Ex. 1 at 3147 ¶ 2.2).

These sections make the segregation of funds indispensable to a licensee's fiduciary duties.  Therefore, when an insurer relieves a licensee from its duty to segregate the funds, the licensee is also relieved from its obligation to hold the funds in a fiduciary capacity.  Section 1758.661 does not specify whether, and to whom, a written notice must be transmitted.

The release of the licensee's fiduciary duty depends on a written provision by the insurer.  The California Insurance Code defines an insurer as the "person who undertakes to indemnify another by insurance."  CAL. INS. CODE § 23.  In this case, Liberty Mutual – not Asurion – is the insurer because it provided the insurance policy through its agent, Asurion.  The Service Agreement between Asurion and the Debtor provides that an insurer will issue an insurance policy, thereby clarifying that Asurion is not the insurer.  (Asurion Trial Ex. 1 at 3145 ¶ 1.1).

19

Similarly, the Agency Agreement and the IMPAA both state that Asurion is Liberty Mutual's agent and that it shall market the insurance and solicit related business.  (Debtor's Trial Ex. 5 at 3185-86; Debtor's Trial Ex. 12 at 3442-43).

Therefore, as the insurer, only Liberty Mutual could have relieved the Debtor from holding the funds collected as Premiums in a fiduciary capacity by providing in writing that the Debtor need not segregate funds.  <u>See</u> CAL. INS. CODE § 1758.661.  Both the Agency Agreement and the IMPAA are silent as to segregation of funds, but they explicitly provide that "communication equipment vendors and their representatives are not fiduciaries of Liberty Mutual."  (Debtor's Trial Ex. 5 at 3189; Debtor's Trial Ex. 12 at 3445).

As noted above, segregation of funds is the <u>sine</u> <u>qua</u> <u>non</u> of the statutory fiduciary duty: without segregation, there is no fiduciary relationship.  But the converse is also true: without any fiduciary relationship, there is no requirement, or point, to segregation of funds.  Here, because the insurer has provided in writing that no fiduciary relationship exists between it and the Debtor, the Court concludes that the insurer – and by extension, Asurion – has waived any right to assert a fiduciary relationship arising under section 1733.

This is admittedly a close call, but for the Court to hold otherwise would impose a fiduciary relationship where clearly

20

none was intended (see Section III.A above regarding lack of evidence supporting recognition of fiduciary duties arising under the Service Agreement) and where such a relationship was in fact expressly disclaimed.  Moreover, because the Court has already determined that the statutorily-required segregation of Premiums[4] was neither contemplated nor required under the Service Agreement, Asurion is asking this Court to conclude that the parties embarked upon the handset insurance program – which Asurion set up for the Debtor – in violation of California law from the outset.  The Court is unwilling to so find. Accordingly, the Court concludes that the fiduciary relationship otherwise arising under section 1733 was effectively waived in accordance with section 1758.661 when the insurer provided in writing that Amp'd is not its fiduciary.

C.    **Identification of a Trust Res**

As a final matter, the Debtor argues that even if Asurion were able to establish either a contractual or statutory basis for a fiduciary relationship here, Asurion's request for imposition of a constructive trust must fail due to the absence of an identifiable trust res.  (Debtor's Br. 20 ¶ 52).

As noted above, a party seeking imposition of, and recovery through, a constructive trust must establish several elements.

---

[4]    See CAL. INC. CODE §§ 1734 and 1734.5 (expressly requiring premiums to be held in separate accounts).

In addition to proving up a fiduciary relationship, a claimant must be able to identify with specificity the funds or assets held in trust.  Where funds are held and segregated, this task is easy.  Where monies are commingled with the constructive trustee's other funds, a claimant must be able to trace trust funds in order to recover.  <u>Goldberg v. New Jersey Lawyers' Fund for Client Protection</u>, 932 F.2d 273, 280 (3d Cir. 1981).

In the present case, the record is abundantly clear that the Debtor did not segregate, or otherwise separately treat or account for, Premiums received from customers.  Accordingly, it is Asurion's burden to trace Premiums if it is to recover.  <u>First Federal of Michigan v. Barrow</u>, 878 F.2d 912, 915 (6th Cir. 1989) ("[A]ny party seeking to impress a trust upon funds for purposes of exemption from a bankrupt estate must identify the trust fund in its original or substituted form.").

The Debtor did not maintain separate accounts to hold Premiums, but instead deposited them into its general operating accounts.  (Debtor's Trial Ex. 25 at 73-74; Debtor's Trial Ex. 29 at 54:24-55:6).  These general operating accounts held funds received by the Debtor from a variety of sources, including routine customer payments and infusions of cash from Kings Road, the Debtor's secured lender.  (Debtor's Trial Ex. 73:12-74:7).  Moreover, the record reflects that the accounts into which the Premiums and other funds were deposited were "sweep" accounts.

22

(Debtor's Trial Ex. 29 at 73:15-74:23).  This means that on a
daily basis all funds deposited were thereupon moved, or "swept,"
into a general operating account, which was itself swept to a
baseline balance of $150,000.  (Debtor's Trial Ex. 29 at 73:15-
74:23).

Again, the Third Circuit's decision in <u>Columbia Gas</u> is
instructive on this point.  To assist in determining trust
beneficiaries' rights in a commingled account, the Court adopted
the lowest intermediate balance rule.  <u>Columbia Gas</u>, 997 at 1063
(citing <u>Barrow</u>, 878 F.2d at 916).  In operation, the lowest
intermediate balance rule "allows trust beneficiaries to assume
that trust funds are withdrawn last from a commingled account."
<u>Id.</u>  However, this rule also assumes that withdrawn trust funds
are not replenished by new or later deposits.  <u>Id.</u>  "Therefore,
the lowest intermediate balance in a commingled account
represents trust funds that have never been dissipated and are
reasonably identifiable."  <u>Id.</u>

Applying these principles and considering the way the Debtor
handled funds it received (which, in the Court's experience, is
neither unusual nor improper for a commercial enterprise such as
the Debtor), Asurion cannot trace and identify with particularity
funds to which it claims an interest beyond the baseline deposit
level of $150,000.

The Debtor's practice of utilizing concentration accounts

23

and daily sweeps renders it a practical impossibility for any
party to trace, track or follow particular monies, beyond
retained account balance amounts, after they enter the Debtor's
cash management system.  The Court notes that there is nothing in
the record to suggest that these cash management procedures were
implemented or utilized in an effort to frustrate the rights of
Asurion or any other creditor.  But in the absence of segregation
of Premiums (or at least an obligation and an effort to
separately track and account for the Premiums), Asurion cannot
meet its burden of identifying with particularity a trust res
over and above the $150,000 baseline balance.[5]  See Columbia Gas,
997 F.2d at 1061 (finding that debtor's failure to segregate
refunds was not fatal to claim of constructive trust where
segregation "would be a huge administrative burden" and where
debtor "meticulously track[ed] its refund obligations").

The Court is not unsympathetic to the plight Asurion finds
itself in, but its position is not unique: it provided goods and
services to a company that went into bankruptcy, and now it has a
claim in the bankruptcy case for those unpaid goods and services.
Asurion's request for imposition of a constructive trust is

---

[5]     The Court does not find or rule here that Asurion has
in fact met its burden to trace and identify the sum of $150,000,
but rather finds that the sweep mechanism (which results in the
Debtor "spending" all but $150,000 of the funds in its
concentration account) operates to limit Asurion's prospective
recovery, if it established a right to imposition of a
constructive trust, to the baseline balance of $150,000.

denied.

## **CONCLUSION**

For the reasons set forth above, the requests of Asurion (i) for a determination that the Premiums are not property of the Debtor's estate and (ii) for imposition of a constructive trust over those Premiums are hereby denied.  An appropriate Order follows.

Dated: November 9, 2007

_____
Brendan Linehan Shannon
United States Bankruptcy Judge

25